BRIGHAM CITY, a municipal corporation organized pursuant to the laws of the State of Utah, Plaintiff and Respondent,

v.

MANTUA TOWN, a municipal corporation of the State of Utah, Defendant and Appellant.

No. 860366–CA.

Court of Appeals of Utah.

May 24, 1988.

Edwin F. Guyon, Salt Lake City, for defendant and appellant.

Jeff R. Thorne, Brigham City, for plaintiff and respondent.

Before BENCH, DAVIDSON and JACKSON, JJ.

OPINION

JACKSON, Judge:

Appellant Mantua Town ("Mantua") seeks reversal of a judgment entered by the First Judicial District Court on September 8, 1986, based upon the court's finding that Mantua breached an agreement made with Brigham City regarding treatment of Mantua's sewage. Specifically, the district court concluded that Mantua failed to pay agreed-upon monthly sewer fees and failed to install and maintain flow recording equipment. Mantua was ordered to pay $24,108 in arrearages, to install flow recording equipment at manhole 48, and to pay monthly sewer fees equal to monthly rates charged similar users of Brigham City. Respondent Brigham City seeks double costs and remand for a determination of attorney fees pursuant to R. Utah Ct. App. 33(a). We affirm the trial court's judgment and award reasonable attorney fees and double costs on appeal to Brigham City, in amounts to be determined by the trial court on remand.

On March 12, 1981, Brigham City and Mantua entered into a contract drawn by Mantua whereby Brigham City agreed to provide sewage treatment for Mantua. Since the execution of the contract, Brigham City has increased the monthly rates charged single family dwellings and churches in Mantua and Brigham City from $3.00 to $6.00, and then from $6.00 to $10.00. Brigham City admitted that the first rate increase was occasioned in part by the city's need for new airport and softball park lighting, a water meter change program, and engineering costs incurred in upgrading its sewage treatment

plant. Since the execution of the contract, Mantua has remitted no more than $3.00 per user per month, although acknowledging receipt of notice of increases.

Mantua installed at manhole 48 near Brigham City a "metering device" which requires manual inspection and measurement to collect sewage flow data. Mantua also installed within its own corporate limits "flow recording equipment" which does not require manual readings.

Although not well articulated by appellant, there appear to be four issues before this court. First, did the district court err as a matter of law in determining that a "metering device" is not "flow recording equipment" under the terms of the agreement? Second, did the trial court erroneously construe the term "similar users" to require Mantua to pay sewer fee rates at an amount equal to the monthly rate charged similar residential, commercial, and industrial users in Brigham City times the number of connections used by Mantua? Third, did the trial court erroneously compute the amount of fees that Mantua should be required to pay? Finally, should Brigham City be awarded double costs, damages and attorney fees because Mantua's appeal is frivolous or brought for delay?

## I. CONTRACT TERMS AND FINDINGS

In construing a written contract, the primary goal is to give effect to the intentions of the parties. *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988). In this regard, questions of contract interpretation determined by the words of the agreement are matters of law. *Id.; Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). On such questions we review the ruling for correctness and accord the trial court no particular deference. *Buehner Block Co.*, 752 P.2d at 895. *See Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884 (Utah 1988).

If the contract is ambiguous or incomplete and the trial court bases its construction on extrinsic evidence regarding the parties' intent, the determination is one of fact. *Kimball*, 699 P.2d at 716; *Seashores Inc. v. Hancey*, 738 P.2d 645, 647 (Utah App.1987). On review, "this court is obliged to review the evidence and all inferences that may be drawn therefrom in a light most supportive of the findings of the trier of fact." *Seashores Inc.*, 738 P.2d at 647 (quoting *Kimball*, 699 P.2d at 716). The trial court's findings of fact will not be disturbed if they are based upon substantial, competent, and admissible evidence. *Kimball*, 699 P.2d at 716; *Circle Airfreight v. Boyce Equip.*, 745 P.2d 828, 829 (Utah App.1987). *See Porter v. Groover*, 734 P.2d 464, 465 (Utah 1987) (the *Kimball* standard is equivalent to the "clearly erroneous" standard of Utah R. Civ.P. 52(a)). When the parties present conflicting evidence, we will defer to the trial court and acknowledge its advantageous position to determine the credibility and weight of the evidence. *Smith v. Utah Cent. Credit Union*, 727 P.2d 219, 220 (Utah 1986).

Although the trial court in this case did not indicate that the contract was ambiguous, the findings of fact are replete with references to extrinsic evidence of the parties' intentions. Moreover, much of the evidence presented and properly received by the trial court was testimony regarding trade usage or custom to explain the particular meaning of technical terms found in the contract and to generally elucidate the intention of the parties. *See Craig Food Indus., Inc. v. Weihing*, 746 P.2d 279, 283 (Utah App.1987). The trial court obviously interpreted this contract as a matter of fact. We therefore review the record to determine whether the challenged findings are clearly erroneous.

### A. "Flow Recording Equipment"

The first issue in this case involves the interpretation of the phrase "flow recording equipment" at paragraph three of the contract:

Mantua further agrees to install and maintain at its expense flow recording equipment at or near the point of delivery of its sewage to Brigham City and to make the records of such flow available to Brigham City upon request.

The trial court entered the following findings:

21. The only engineers who were called and testified on this matter were Kent Jones, Brigham City Engineer, and engineers from James M. Montgomery called by Brigham City.

22. These engineers testified that the metering device installed by Mantua in Brigham City was totally inadequate and did not constitute flow recording equipment.

23. The court finds that the provision in the agreement for flow recording equipment was placed therein at the request of Brigham City Public Works Director, who by letter (Pl.Ex. 12) pointed out that these records would be useful to monitor growth, to prepare State and EPA Questionaires, [sic] and as a check against excessive surface and sub-surface water discharged into the system.

24. Mantua's Engineer, Keith Hansen, who was not called by Mantua, concurred in Mr. Nuetzman's [Brigham City's Public Works Director] recommendation.

Based upon these findings, the trial court ordered Mantua to install at manhole 48 flow recording equipment similar to the recording equipment presently installed in Mantua.

Mantua makes three arguments: first, that the contract clearly permits the installation of any type of equipment near Brigham City; second, that even if the contract specifically required "flow recording equipment" near Brigham City, Mantua complied with contract requirements by installing a metering device at manhole 48 near Brigham City and flow recording equipment in Mantua; third, that Brigham City acquiesced to Mantua's construction specifications and plans which placed the flow recording equipment in Mantua and a metering device at manhole 48.

Brigham City responds that the metering device installed at manhole 48 is inadequate to monitor the flow of sewage as contemplated by the parties. Brigham City also argues that a "metering device" does not constitute "flow recording equipment."

■ Mantua's first argument that the contract is unambiguous regarding the installation of flow recording equipment may be treated summarily. Both parties presented extrinsic evidence on this issue and the evidence was received without objection. Therefore, Mantua may not claim on appeal that the document is clear on this issue and not subject to interpretation with extrinsic evidence. *Co–Vest Corp. v. Corbett,* 735 P.2d 1308, 1309 (Utah 1987).

Mantua produced no evidence at trial to rebut the expert testimony presented by Brigham City that a "metering device" is not the equivalent of "flow recording equipment" under the terms of the agreement. The trial court has considerable discretion in determining the admissibility and weight to be given to the expert testimony offered by Brigham City. *See Craig Food Industries, Inc.,* 746 P.2d at 282–83. The trial court properly considered the expert testimony as well as the letter produced by Brigham City showing that the flow recording equipment requirement was inserted at the request of Brigham City, and with the concurrence of Mantua's engineer, in order to monitor the system.

■ Mantua argues that Brigham City acquiesced in Mantua's location of the metering device and flow recording equipment under either equitable estoppel or waiver principles. We are not so persuaded. There is nothing in the record to indicate, nor did the trial court find, that Brigham City's actions were inconsistent with or sufficient to nullify the flow recording provision. Rather, Brigham City consistently maintained that Mantua remained subject to the flow recording equipment provision. Absent a showing that Brigham City unequivocally intended to waive its rights under the provision, we will defer to the trial court ruling. *See Barnes v. Wood,* 750 P.2d 1226, 1230 (Utah App.1988).

The findings and judgment concerning the requirement to install flow recording equipment are based upon substantial, competent, and admissible evidence. The trial court's ruling that Mantua breached the

flow recording provision is affirmed,[1] and Mantua must install flow recording equipment at manhole 48 and make flow records available to Brigham City upon request.

### B. "Similar Users"

The second issue involves the interpretation of the term "similar users." Paragraph four provides in part:

Mantua shall pay to Brigham ... an amount equal to the monthly rate charged similar users of Brigham City for monthly sewer service times the number of such connections in use in the Town of Mantua during that particular month.

The trial court found that:

16. In 1980 it appeared that neither Mantua nor Brigham had any different interpretation of the agreement. The official minutes of Mantua Town held November 2, 1980 state: "When we tie into Brigham's system, we will be subject to the same fees as Brigham City residents pay." (See Pl.Ex. 62).

37. Mantua ... asserts that it should be treated as a single user, notwithstanding advice from its former attorney and drafter of the contract that the contract did not permit such interpretation.

38. The court finds that the position of Mantua is not supported by the wording of the contract and the intent of the parties as evidenced by the evidence received by this court, and that Mantua is obliged to pay the same amount per month as users in Brigham City pay for sewer service.

42. The court finds that for any future rate increases, Mantua shall pay the same amount per dwelling and churches as are paid by dwellings and churches in Brigham City per month.

The trial court ordered Mantua to pay, beginning July, 1986,

an amount equal to the monthly rate charged similar users of Brigham City for monthly sewer service times the number of such connections in use in the Town of Mantua during that particular month. In the absence of any commercial connections, the rate charged similar users will be the rate charged to dwellings or churches in Brigham City pursuant to Brigham City Ordinances.

Mantua argues that the trial court erroneously identified the individual residents of Mantua as the contracting party. The contracting party, according to Mantua, is the Town of Mantua as a single entity and not the individual residents. Therefore, the term "similar users" means another town, similarly situated, which has also contracted for sewage services with Brigham City. Brigham City responds that the term "similar users" refers to the classifications of connections found in the Brigham City ordinance in effect when the contract was negotiated and signed: (1) single family units; (2) multiple units; and (3) commercial, industrial and others.

Although Mantua asserts that it should be classified as a single user, Mantua's former attorney and drafter of the contract advised Mantua that the contract did not permit such interpretation. Mantua's former mayor, who signed the contract, testified in his deposition that the term "similar users" meant the type of connection, i.e., residential, industrial, or commercial. Mantua's position is not supported by the evidence. We therefore affirm the trial court's determination that Mantua became obligated to pay Brigham City an amount equal to the monthly rate charged church and residential dwellings times the number of connections in use in Mantua.

### C. Sewer Fee

The third issue is whether the trial court erroneously computed arrearages. The relevant contract provision is as follows:

---

**1.** Mantua also asserts that it is now impossible to substitute "flow recording equipment" for the "metering device" at manhole 48. A member of Mantua's city council testified as to the "possibility" that the shallow depth of the manhole would present problems in complying with an order to install flow recording equipment.

Mantua does not direct us to any other evidence supporting an impossibility argument. Apparently the trial court concluded that Mantua's impossibility argument was without merit. We find nothing in the record or in Mantua's appeal brief to support a ruling to the contrary.

In determining the amount to be paid for any particular month under this paragraph, the rate charged shall be the applicable rate for that month charged to similar users of Brigham City. It is understood that the rates charged herein to Mantua shall cover the costs of normal operation, maintenance, and repair and/or replacement of those Brigham City sewer lines and treatment facilities used to convey and treat Mantua's sewage. At any time when the rates charged users in Brigham City shall either be raised or lowered, the amount payable by Mantua to Brigham City under this paragraph shall also change accordingly. Provided, however, if conditions occur which require expenditures by Brigham City for greater capacity in the Brigham City sewer lines or sewage treatment plant than is available at the time of such occurrence, or if an enlargement, replacement, or repair of existing sewer lines or treatment facilities located in Brigham City is reasonably required to accommodate or convey Mantua sewage, then Mantua agrees herein to pay its fair and reasonable share of the costs of providing such additional facilities, capabilities, or repairs either through increased monthly sewage service fees or a cash contribution. Provided further, if conditions occur which require expenditures by Brigham City for greater capacity in the Brigham City sewer lines or sewage treatment plant than is available at the time of such occurrence, or if enlargement, replacement, or repair of existing sewer lines or treatment facilities located in Brigham City is needed to reasonably accommodate or convey sewage from somewhere other than Mantua, then Mantua shall pay no more than its fair and reasonable share of the costs of providing such additional facilities, capabilities, or repairs.

The trial court found that:

29. Prior to the time Mantua had any homes connected to its sewer system, Brigham City increased the rates for single family dwellings and churches from $3.00 to $6.00 per month. This change took place on July 1, 1982.

30. The rate increase from $3.00 to $6.00 was occasioned in part for increased lighting at the airport, new lights for a softball field, and a water meter change program, as well as engineering costs for upgrading the sewer treatment plant.

31. Roger Handy, Administrative Assistant for Brigham City, testified that the revenue obtained under the rate increase from $3.00 to $6.00 was used in part for these purposes for fiscal year ending June 30, 1983. He testified that the transfer from sewer to these uses ended on June 30, 1983.

33. Mantua was obligated to pay $3.00 per connection (for dwelling and churches) times the number of such connections in use in the Town of Mantua from the first delivery of sewage into the Brigham City system until the end of June 1984.

35. The court finds that Mantua is obligated to pay the sum of $10.00 per month per connection beginning with July 1984 until the rates were again increased.

36. The court finds that the change in rates to $10.00 was directly related to the sewer charges, including the engineering and financing which are essential parts of the sewage improvement system.

41. The court finds that the amount of money due to Brigham City under the contract is the sum of $24,108.00 which represents $7.00 additional monthly fee from July 1984 through June 1986 for each connection within Mantua and judgment should enter against Mantua in favor of Brigham City in the sum of $24,108.00 for delinquent amounts due under the contract.

43. The court finds that Mantua was notified in sufficient time of all rate increases requested by Brigham City, and Mantua admitted that they were aware of the rate increases.

Mantua claims that its residents were charged four times as much as Brigham City residents for the same sewer service. Mantua asserts that its residents should be charged for the actual costs of normal op-

eration, maintenance and repairs, or approximately $1.31 per user per month. Mantua resists having to pay costs associated with upgrading Brigham City's treatment plant.

Brigham City claims that if Mantua residents paid for the actual costs of services, they would pay more than the amount being paid by Brigham City residents because Brigham City's other utilities subsidize the sewer system. Brigham City argues that Mantua drafted the agreement, which should be construed against it, and the agreement requires that Mantua pay the same rate as that paid by Brigham City residents, including upgrading costs.

An engineer employed by Brigham City to design a new sewer plant testified that Brigham City was required to build a new treatment plant in order to comply with Federal Environmental Protection Agency and State Regulatory Agency requirements. The engineer testified that his firm had fully studied the matter and felt that the new plant was the most economical means to meet the standards imposed upon Brigham City. Based upon this evidence, the trial court awarded Brigham City $24,108, which excludes amounts related to new airport and softball field lights and Brigham City's water meter change program. The trial court findings and judgment for past due amounts were properly rendered in favor of Brigham City.[2]

## II. COSTS AND ATTORNEY FEES

■ The final issue is whether Brigham City is entitled to an award, as requested, of attorney fees and double costs on the grounds that Mantua's appeal is frivolous or brought for delay. Rule 33(a) of the Rules of the Utah Court of Appeals provides that "[i]f the court determines that a motion made or an appeal taken under these rules is either frivolous or for delay, it shall award just damages and single or double costs, including reasonable attorney

fees, to the prevailing party." We have defined a "frivolous appeal" as "one having no reasonable legal or factual basis as defined in Rule 40(a)." *O'Brien v. Rush*, 744 P.2d 306, 310 (Utah App.1987). "An appeal brought for delay is one marked by dilatory conduct or conduct designed to mislead the court and which benefits only the appellant." *Id.* Rule 40(a) of our rules states:

> The signature of an attorney or a party constitutes a certificate that the attorney or the party has read the motion, brief, or other paper; that to the best of the attorney's or the party's knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purposes, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

The first issue Mantua challenged on appeal is the trial court's order that Mantua install "flow recording equipment" at manhole 48. Mantua's council minutes from July 8, 1982 reflect that Mantua understood flow recording equipment was to be placed in Brigham City. Minutes from November 11, 1982 reflect that Mantua was aware Brigham City did not agree to the eventual placement of the sewer flow meter. The second and third issues on appeal concern Mantua's challenge of the meaning of the words "similar user" and the amount of sewer fee charges it must pay. Prior to trial, Mantua sought the advice of its attorney and drafter of the contract regarding the question of multiple sewer connections within Brigham City. The attorney advised Mantua by letter that,

> [i]n my opinion, the contract provides simply that a user in Mantua will be charged the same rate as a similar user in Brigham City. Therefore, a multiple connection in Mantua as it is defined in

---

**2.** An administrative assistant for Brigham City testified that the revenue obtained under the rate increase from $3.00 to $6.00 amounted to $2.24 per connection per month of non-sewer uses. Brigham City has not filed a cross-claim seeking the remaining $3.76 per connection per

month of sewer charges during the fiscal year ending June 30, 1983. Although Brigham City may have been entitled to recover the remaining amounts, we do not disturb the trial court's refusal to award those amounts.

the Brigham City ordinance would be charged the same as such connection in Brigham City.... The whole town of Mantua could not be considered as a multiple connection, if that is what you were asking.

Minutes of a Mantua Town meeting held November 20, 1980 state: "When we go into Brigham's system we will be subject to the same fees as Brigham residents pay."

The record shows a deliberate course of conduct designed to frustrate the purposes of the parties' agreement and an attempt by Mantua to "rewrite the whole contract." As could reasonably be expected, Mantua did not prevail on these issues at trial. There was no legal or factual basis upon which they could reasonably expect to prevail. Likewise, there was no reasonable basis for their appeal to this court. We find this conduct to be conspicuously bad and offensive, i.e., egregious. We find the appeal to be both frivolous and interposed for delay and hold that Brigham City is entitled to recover an award of reasonable attorney fees and double costs on appeal.

### III. CONCLUSION

The judgment of the trial court is affirmed. We remand for a determination of Brigham City's reasonable attorney fees and double costs on appeal.

DAVIDSON, J., concurs.

BENCH, Judge: (Concurring and Dissenting):

I concur in affirming the judgment of the trial court. I dissent from the award of double costs and attorney fees under R. Utah Ct.App. 33(a).

Damages are awardable under Rule 33(a) if the appeal is taken for delay or if the issues presented on appeal are frivolous. As the majority states, this Court defines a frivolous appeal as "one having no reasonable legal or factual basis as defined in [R. Utah Ct.App.] 40(a)." *O'Brien v. Rush*, 744 P.2d 306, 310 (Utah App.1987). In support of its award, the majority points to several factors, including deliberate attempts by Mantua to frustrate the pur-

poses of the agreement and Mantua's failure to prevail at trial and on appeal. I am not persuaded that these factors render the appeal void of any reasonable legal or factual basis. On the contrary, I believe defendant's claims on appeal, although unsuccessful, had some merit worthy of consideration as evidenced by the content of the majority opinion.

This Court recently stated, "We recognize that sanctions for frivolous appeals should only be applied in egregious cases, lest there be an improper chilling of the right to appeal erroneous lower court decisions." *Porco v. Porco*, 752 P.2d 365, 369 (Utah App.1988). This case is not the "egregious" case where sanctions should be imposed. Indeed, the award of damages in this case will have a chilling effect on the right to appeal erroneous trial court decisions.